Nollie Lee MARTIN,
Petitioner-Appellant,

v.

Louie L. WAINWRIGHT,
Respondent-Appellee.

No. 84–5695.

United States Court of Appeals,
Eleventh Circuit.

Aug. 26, 1985.

---

\* Honorable Santiago E. Campos, District of New Mexico, sitting by designation.

Hatchett, Circuit Judge, filed opinion concurring in part and dissenting in part.

Richard L. Jorandby, Public Defender, Craig S. Barnard, Michael Mello, Asst. Public Defenders, West Palm Beach, Fla., for petitioner-appellant.

Jim Smith, Atty. Gen., Joan Fowler Rossin, Asst. Atty. Gen., Dept. of Legal Affairs, Office of Atty. Gen., West Palm Beach, Fla., for respondent-appellee.

Before GODBOLD, Chief Judge, KRAVITCH and HATCHETT, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant Nollie Lee Martin was convicted in Palm Beach County, Florida, of first-degree murder, kidnapping, armed robbery, and forcible sexual battery, and was sentenced to death. After exhausting his state remedies, Martin filed in federal district court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied the petition, and Martin now appeals, arguing that: (1) his July 4, 1977 confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) his July 4 confession was involuntary; (3) his July 11, 1977 confession was obtained in violation of *Miranda;* (4) his July 11 confession was obtained in violation of his Sixth Amendment right of counsel; (5) his July 11 confession was involuntary; (6) the state trial court committed constitutional error by refusing to appoint an additional mental health expert to assist his defense; (7) the state trial court violated *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), by excluding or refusing to consider, at sentencing, certain evidence concerning the deterrent effect of the death penalty; (8) the state trial court committed constitutional error by excluding, at trial and at sentencing, certain jail records; (9) his Sixth Amendment right of confrontation was violated when a deposition was read into evidence at sentencing without a prior showing of the witness' unavailability; and (10) his Sixth, Eighth, and Fourteenth Amendment rights were violated by the use of a death-qualified jury at trial.[1] We affirm.

## I. BACKGROUND

On June 25, 1977, just before 10 p.m., two men entered a convenience store in Delray Beach, Florida, where Patricia Greenfield, a college student, was employed. The men, later identified as Nollie Lee Martin and Gary Forbes, robbed Greenfield at knife point of approximately ninety dollars and two cases of beer, and abducted her from the store. They drove her back to Martin's apartment, blindfolding her along the way with Martin's shirt.

---

**1.** Martin's brief on appeal also included a claim that the Supreme Court of Florida's practice of receiving *ex parte* information in capital cases violated his constitutional rights. This claim was dropped, however, prior to oral argument.

Both men committed forcible sexual battery on her at the apartment.

Martin and Forbes then transported Greenfield away from the apartment, keeping her blindfolded and assuring her that she would be released at a remote area. After driving some distance in an aimless fashion, they arrived at the vicinity of the Lantana Dump, and Martin walked the victim away from the sight of Forbes. According to Forbes, Martin stated that he attempted to strangle or suffocate the victim with a short piece of rope, but that she recovered her breath each time he thought she had succumbed. Martin then stabbed her several times in the throat. The autopsy revealed that Greenfield died of the stab wounds, and that a struggle probably preceded her death.

On the afternoon of July 4, 1977, Martin and Forbes were arrested by detectives from the Palm Beach County Sheriff's Office on charges unrelated to the Greenfield murder.[2] Later that day, under police interrogation, Martin confessed to having killed Patricia Greenfield. On July 11, 1977, Martin again confessed to the murder.

Martin was indicted for first-degree murder, kidnapping, armed robbery, and forcible sexual battery.[3] He pleaded not guilty and filed a notice of intent to rely on the defense of insanity. A pre-trial motion to suppress Martin's July 4 and July 11 confessions was denied. Martin was found competent to stand trial and was tried before a jury, which convicted him on all counts and recommended the death penalty. The trial court sentenced Martin to death.

The Supreme Court of Florida affirmed Martin's conviction and death sentence on direct appeal. *Martin v. State*, 420 So.2d 583 (Fla.1982), *cert. denied*, 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983). Martin's motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 was denied without an evidentiary hearing. The denial was affirmed by the Supreme Court of Florida. *Martin v. State*, 455 So.2d 370 (Fla.1984).

Martin then filed the instant habeas corpus petition in the United States District Court for the Southern District of Florida. The district court denied Martin's petition,[4] and this appeal ensued.

## II. THE CONFESSIONS

Martin challenges, on several grounds, the admissibility of both his July 4, 1977 and July 11, 1977 confessions. He claims that the erroneous admission of these confessions at trial necessitates the reversal of his first-degree murder conviction. We must determine whether the confessions are indeed constitutionally defective, and, if so, whether reversal of the murder conviction is required.

### A. *Miranda* and the July 4 Confession

Martin contends that his July 4 confession was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Martin was arrested at about 2:30 p.m. on July 4, and was interrogated, off and on, from then until 7:55 p.m., when he finally confessed. It is undisputed that Martin was read and waived his *Miranda* rights prior to the start of the interrogation. At one point, however, Martin asked whether the questioning could wait until the next day. L.K. Glover, one of the two Palm Beach County detectives present when Martin made his request, testified at the suppression hearing:

2. Martin and Forbes were arrested on false imprisonment and sexual battery charges in connection with a July 3, 1977 incident involving a prostitute. The state trial court found that the police had probable cause to arrest Martin and Forbes on these charges, and the propriety of this ruling is not before us.

3. Forbes, Martin's accomplice, initially was indicted for the same offenses. Pursuant to an agreement with the police and the prosecutor's office, Forbes pled guilty to second-degree murder and testified for the state at Martin's trial.

4. The district court granted a twenty-four hour stay of Martin's then-pending execution, however, and issued a certificate of probable cause to appeal. This court subsequently stayed Martin's execution pending the resolution of this appeal.

Q. Wasn't there a point in the interview before Mr. Scarola arrived where Mr. Martin expressed a desire to stop talking and to take up the conversation again the next day?

A. I don't recall that. It is possible. It seem to me like he did say something about waiting until the next day and I don'know how it was continued.

Q. Well, did Anderson then just keep questioning him after that, isn't that how it was continued?

A. It is possible.

The other detective present, John J. Anderson, stated:

Q. Now, at some point during the interrogation, didn't Nollie Martin say to you he did not want to make a statement?

A. Not that I recall, no, sir.

Q. Did he say to you, "I don't want to make a statement today, I'll talk to you tomorrow?"

A. He said something about, "Can't we wait until tomorrow?"

Q. Okay. In response to that, you just kept questioning him, didn't you?

A. Yes, sir. I said, "Let's go on."

The Supreme Court held in *Miranda* that police must follow certain guidelines when conducting custodial interrogations, in order to protect the constitutional rights of the suspect. Under *Miranda*, the police not only must give the suspect the now-familiar set of warnings,[5] but also must scrupulously honor the suspect's right to cut off questioning. As the *Miranda* Court emphasized: "If the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627 (emphasis added).

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court explored in greater detail the scope of a suspect's right to cut off questioning. There, the Court explained:

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." 384 U.S., at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's right to cut off questioning." *Id.*, at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control *the time at which questioning occurs*, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 103–04, 96 S.Ct. at 326 (emphasis added; footnote omitted).

Applying the principles of *Miranda* and *Mosley* to the facts of the instant case, we conclude that Martin's right to cut off questioning was not "scrupulously honored" during the July 4 interrogation. It is true that Martin's request, "Can't we wait until tomorrow," was an equivocal invocation of his right to cut off questioning, and that Martin never explicitly refused to answer any more questions. Nevertheless, Detective Anderson's continuation of the interrogation was improper. We previously have held that equivocal invocations of the right to counsel immediately limit the

---

**5.** [The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that

if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630.

scope of police questioning to "clarifying [the] equivocal request." *Thompson v. Wainwright*, 601 F.2d 768, 771 (5th Cir. 1979); *see Nash v. Estelle*, 597 F.2d 513, 517 (5th Cir.) (*en banc*), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). As we explained in *Thompson:*

> [W]henever even an equivocal request for an attorney is made by a suspect during a custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified.... And no statement taken after that request is made and before it is clarified ... can clear the *Miranda* bar.

*Id.* at 771–72 (emphasis in original).

█ We see no reason to apply a different rule to equivocal invocations of the right to cut off questioning. In the instant case, therefore, the only proper course of action would have been to attempt to clarify whether Martin indeed intended to invoke his right to cut off questioning. Instead, Detective Anderson simply replied, "Let's go on," and continued the interrogation. We hold that this violated the dictates of *Miranda* and *Mosley*,[6] and that the July 4 confession thus was inadmissible.

### B. Voluntariness and the July 4 Confession

Martin also claims that his July 4 confession was involuntary.[7] The due process "voluntariness" test, as set forth in numerous pre-*Miranda* Supreme Court decisions, requires the suppression of statements "obtained by 'techniques and methods offensive to due process,' *Haynes v. Washington*, 373 U.S. [503,] 515, 83 S.Ct. [1336,] 1344, [10 L.Ed.2d 513 (1963),] or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will,' *id.*, at 514, 83 S.Ct., at 1343...." *Oregon v. Elstad*, — U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). This court's predecessor has held:

> [I]n order to find [the defendant's] confession voluntary, we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.

*Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir.1980) (*en banc*), *cert. denied*, 450 U.S. 1001, 1014, 101 S.Ct. 1709, 1724, 68 L.Ed.2d 203, 214 (1981).[8]

The Supreme Court also has acknowledged, however, that "detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement.... The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw...." *Haynes*, 373 U.S. at 514–15, 83 S.Ct. at 1344. In *Culombe v. Connecticut*, 367 U.S. 568, 582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961), Justice Frankfurter wrote:[9]

---

**6.** In *United States v. Thierman*, 678 F.2d 1331 (9th Cir.1982), the Ninth Circuit reached the opposite conclusion in a case involving a suspect's request, "Can we talk about it tomorrow?" The surrounding circumstances in *Thierman*, however, indicated that the suspect's request concerned a particular subject matter, and not the interrogation in general. *See id.* at 1336.

In any event, to the extent that it is inconsistent with our decision today, we reject the Ninth Circuit's *Thierman* holding. We do not deem it necessary for suspects to use talismanic words in order to invoke their *Miranda* rights. Certainly requests such as "Can I have a lawyer?," or, alternatively, "Can't I have a lawyer?," constitute invocations, albeit equivocal, of the right to counsel. In a similar vein, the requests in both *Thierman* and the instant case constituted invocations of the right to cut off questioning.

**7.** We address this claim because of its potential effect on the admissibility of the July 11 confession. *See infra* section II.C.

**8.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**9.** Justice Frankfurter's plurality opinion was joined only by Justice Stewart. Three of the dissenters, however, Justices Harlan, Clark, and Whittaker, agreed with Justice Frankfurter's

... [W]hatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths.

... But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police.

*Id.* at 571, 579, 81 S.Ct. at 1862, 1866.

■ "Whether [a] confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances." 373 U.S. at 513, 83 S.Ct. at 1343; *see also Jurek,* 623 F.2d at 937 ("This is, necessarily, a case-by-case endeavor. We must weigh the totality of the circumstances and examine their impact on [the defendant].... We must determine whether the sum of the circumstances compels a finding of involuntariness."). Although at trial the prosecution must establish, by a preponderance of the evidence, that a challenged confession was voluntary, *see Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972), on collateral review, the burden of proving involuntariness rests with the habeas corpus applicant. *See Jurek,* 623 F.2d at 937; *Bruce v. Estelle,* 536 F.2d 1051, 1058–59 (5th Cir. 1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). We therefore look to the "totality of the circumstances" surrounding the July 4 interrogation, to determine whether the record supports Martin's contention that the confession was involuntary.

Martin identifies several aspects of the interrogation that he claims represent indicia of coercion. For example, the police admitted to employing a "good guy, bad guy" technique; during the early stages of the interrogation, Detective Anderson, playing the "bad guy," raised his voice at Martin, cursed him, and discussed the death penalty, while Detective Glover and Assistant State's Attorney Jack Scarola, as the "good guys," expressed sympathy for Martin. According to Martin, Anderson also misrepresented the strength of the state's case against him by telling him that codefendant Gary Forbes had confessed, while Scarola promised that an attempt would be made to obtain psychiatric help for him, told him that the truth "couldn't hurt him," and gave him legal advice concerning the possible effect of a confession. Martin argues that the five-hour length of the interrogation and the failure of the police to honor his request to "wait until tomorrow" constitute evidence of coercion. Finally, Martin contends that his emotional mental state, particularly when the discussion turned to the subject of religion, indicates that his confession was involuntary.

■ We agree with the state trial court that certain of the tactics used by the police during the July 4 interrogation were "distasteful," and we disapprove of the overall manner in which the interrogation was conducted. On balance, however, we cannot say that Martin's confession was involuntary. We note initially that none of the improper tactics were so inherently coercive as to produce *per se* involuntariness. As the Supreme Court stated in *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953):

Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose.... When present, there is no need to weigh or measure its effects on the will of the individual victim....

... Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not.... The limits in any case depend upon a

"delineation of the general principles governing police interrogation." *Culombe,* 367 U.S. at 642,

81 S.Ct. at 1900.

weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.

*Id.* at 182–84, 73 S.Ct. at 1091–92. Neither physical violence nor threats of violence were used against Martin, the time when the interrogation occurred indicates that Martin was not deprived of sleep, and the record reveals that Martin was not denied food or drink. Because psychological, not physical, coercion is alleged here, the *per se* involuntariness rule does not apply. *See generally Culombe,* 367 U.S. at 622–23 & nn. 74–83, 81 S.Ct. at 1889–90 & nn. 74–83.

■ Of course, even though none of the improper police tactics, standing alone, mandates a finding of coercion, it is possible that their cumulative effect on Martin was sufficient to render the confession involuntary. The test is whether Martin's "will [was] overborne and his capacity for self-determination critically impaired." *Culombe,* 367 U.S. at 602, 81 S.Ct. at 1879. We conclude that it was not. In judging the overall impact of the interrogation on Martin, we note that he was "not inexperienced in the ways of crime or its detection," *see Stein,* 346 U.S. at 185–86, 73 S.Ct. at 1093, in that he previously had pled guilty to three counts of second-degree murder and one count of arson in North Carolina, for which he had been sentenced to 18 to 30 years in prison, and was on parole at the time the relevant events occurred in Florida.

The state supreme court found, contrary to Martin's assertions, that "the taped statement and testimony clearly show that Martin was not misled or promised anything for giving his statement." *Martin v. State,* 420 So.2d 583, 585 (Fla.1982), *cert.*

*denied,* 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983). This factual finding is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Sumner v. Mata,* 449 U.S. 539, 544–45, 101 S.Ct. 764, 767–68, 66 L.Ed.2d 722 (1981); *Hance v. Zant,* 696 F.2d 940, 957 (11th Cir.) *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).[10]

In addition, this court's predecessor previously has held that some of the kinds of psychological pressure that were used on Martin generally do not render a confession involuntary. In *United States v. Ballard,* 586 F.2d 1060 (5th Cir.1978), the court stated:

Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him "holding the bag" does not, as a matter of law, overcome a confessor's will.... Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary.... A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a coercive atmosphere, the statement may be considered to have been voluntarily made.... [T]elling the appellant in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government.

10. In *Price v. Wainwright,* 759 F.2d 1549 (11th Cir.1985), this court held that the findings of historical fact underlying a state court's resolution of a mixed issue of fact and law are subject to the presumption of correctness under 28 U.S.C. § 2254(d). *See id.* at 1552.

The Supreme Court recently has granted certiorari on the question whether a state court's

finding that a confession was "voluntary" is subject to the § 2254(d) presumption of correctness. *See Miller v. Fenton,* 741 F.2d 1456 (3d Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). Because our resolution of the instant appeal does not rest on such a presumption of correctness, we need not await the Supreme Court's decision in *Miller.*

*Id.* at 1063 (citations omitted). The Supreme Court likewise has declined to find coercion in cases involving twelve hours of interrogation, *see Stein,* 346 U.S. at 185–86, 73 S.Ct. at 1093, promises by police that the defendant's father would be released and that his brother would not be prosecuted, *see id.* at 167, 73 S.Ct. at 1084, and misrepresentations by police that a codefendant had confessed, *see Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969).

■ Although we are troubled by Martin's allegation that Assistant State's Attorney Jack Scarola gave him legal "advice," we are unpersuaded that this constituted coercion. During the interrogation, Scarola told Martin that Florida uses a bifurcated trial in capital cases, and that while a confession would hurt him at the guilt phase it might help him at sentencing. Scarola also admonished Martin that "it is only the truth that can help you." As a prosecuting attorney, Scarola should not have engaged in such discussions with a soon-to-be defendant. Nevertheless, in light of the above-quoted language from *Ballard,* we conclude that Scarola's indiscretions did not render Martin's confession involuntary.[11]

■ The record also does not support an inference that either the five-hour length of the interrogation or the failure to honor Martin's request to "wait until tomorrow" rendered the confession involuntary. The interrogation took place during normal waking hours, Martin was questioned off and on rather than continuously, and fatigue does not appear to have been a factor in Martin's decision to confess. We also find it significant that Martin never explicitly refused to answer any more questions.[12]

Finally, this court previously has indicated that although confessions made during a time of mental incompetency or insanity are involuntary, "mere emotionalism and confusion do not necessarily invalidate them." *Corn v. Zant,* 708 F.2d 549, 567 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984); *Sullivan v. Alabama,* 666 F.2d 478, 483 (11th Cir.1982). In the instant case, the state trial court noted that "it has been helpful to the Court to have the question of voluntariness of the statement illustrated by an actual voice recording of what really occurred at the instant of the making of the statement. I find that ... the tape recorded statement of July 4th ... reflect[s] *the indicia of voluntariness.*" The trial court also found that "[t]he context of the actual statement which followed this questioning reflects *a reasoned and logical discussion* .... The statement reflects a competent recitation of the facts." We defer to these findings, based as they are on the trial court's unique opportunity to listen to the tape recording and evaluate Martin's own words and voice. *Cf. Frazier v. Cupp,* 394 U.S. at 739, 89 S.Ct. at 1425 ("Petitioner also presses the alternative argument that his confession was involuntary.... The trial judge, after an evidentiary hearing during which the tape recording was played, could not agree with the contention, and our reading of the record does not lead us to a contrary conclusion.").

In conclusion, although the interrogation that preceded Martin's July 4 confession was hardly a model one, none of the improper techniques used by the police were so inherently coercive as to require a finding of *per se* involuntariness. Furthermore, based on the totality of the circumstances, Martin has failed to satisfy his burden of proving that the confession was the product of forces that combined to

---

**11.** Martin also claims that he thought Scarola was his defense attorney. We find this claim incredible. Martin was not a novice in the ways of the law and, furthermore, clearly was told that Scarola was a prosecutor whose job was to convict him.

**12.** Although an explicit refusal to answer further questions was not necessary in order for Martin to invoke his right to cut off questioning under *Miranda* and *Mosley, see supra* section II.A., we find the absence of such an explicit refusal to be probative evidence on the issue of voluntariness.

overbear his free will. We therefore hold that, despite its inadmissibility under *Miranda*, Martin's July 4 confession was voluntary.

### C. "Fruit of the Poisonous Tree," the "Cat Out of the Bag" Rule, and the July 11 Confession

We next must decide whether the July 4 *Miranda* violation automatically renders the July 11 confession inadmissible, either under the so-called "fruit of the poisonous tree" doctrine, or under a more recently developed legal theory known as the "cat out of the bag" rule. The Supreme Court recently addressed these precise issues in *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). We therefore conduct our analysis along the lines suggested by the Court in *Elstad*.

### 1. "Fruit of the Poisonous Tree"

In *Elstad*, the Court began by considering whether, and under what circumstances, the failure to administer *Miranda* warnings prior to a confession "taints," under the "fruit of the poisonous tree" doctrine, a subsequent confession. The Court noted that the "fruit of the poisonous tree" doctrine applies only to *constitutional* violations. *Id.* at ——, 105 S.Ct. at 1291. The *Miranda* exclusionary rule, however, "sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony." *Id.* at ——, 105 S.Ct. at 1292 (footnote omitted; emphasis in original). *Miranda* creates a "presumption of compulsion," which, "though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted." *Id.* The Court concluded:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine

*the suspect's ability to exercise his free will* so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at ——, 105 S.Ct. at 1293–94 (emphasis added). In other words, so long as the prior, unwarned confession satisfies the "due process voluntariness test," *id.* at ——, 105 S.Ct. at 1293 (quoting Schulhofer, *Confessions and the Court*, 79 Mich.L. Rev. 865, 877 (1981)), the subsequent confession is not automatically rendered inadmissible under the "fruit of the poisonous tree" doctrine.

■ The instant case differs from *Elstad* in that it involves a failure to honor the suspect's request to "cut off" questioning rather than a failure to give *Miranda* warnings. Nevertheless, the same reasoning necessarily applies. As explained in the preceding subsection, Martin's July 4 confession was voluntary. As in *Elstad*, the police here violated the technical requirements of *Miranda*, but did *not* violate the Fifth Amendment itself. The absence of "actual coercion" in connection with the July 4 interrogation renders the "fruit of the poisonous tree" doctrine inapplicable, and we hold that the July 4 *Miranda* violation does not automatically require the exclusion of the July 11 confession on this ground.

### 2. The "Cat Out of the Bag" Rule

The remainder of the *Elstad* opinion concerns the so-called "cat out of the bag" rule. This rule, originally derived from the Supreme Court case of *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), is based on the notion that a defendant who has once let the "cat out of the bag" by confessing to a crime is "never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the

bag." *Id.* at 540, 67 S.Ct. at 1398. Relying on *Bayer*, some lower courts have held that the giving of either an unwarned or a coerced confession fatally compromises the voluntariness of all subsequent statements.[13]

In *Elstad*, the Supreme Court flatly rejected such a broad interpretation of the "cat out of the bag" rule:

This Court has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver.... *When neither the initial nor the subsequent admission is coerced*, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder.

There is a vast difference between the direct consequences flowing from *coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will* and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question ....

... [T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made.

—— U.S. at ——, ——, 105 S.Ct. at 1295, 1298 (emphasis added; footnote omitted). The Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at ——, 105 S.Ct. at 1298.

As with the "fruit of the poisonous tree" doctrine, the Court's reasoning in *Elstad* disposes of the "cat out of the bag" issue. Here, the police used neither "physical violence" nor "other deliberate means" to coerce Martin's first confession. Rather, as in *Elstad*, the first confession was voluntary, although obtained through a technical violation of *Miranda.* We see no basis for treating a failure to honor a suspect's right to "cut off" questioning any differently from a failure to give *Miranda* warnings,[14] and we hold that the July 4 *Miranda* violation does not automatically require the exclusion of the July 11 confession.

### D. *Miranda* and the July 11 Confession

Having held that the admissibility of the July 11 confession is not determined by our

---

**13.** The "cat out of the bag" rule differs from the aforementioned "fruit of the poisonous tree" doctrine in that it concerns the effects of the *suspect's* conduct, namely, the giving of the first confession, rather than the effects of the unlawful *police* conduct. *See Elstad,* —— U.S. at ——, 105 S.Ct. at 1294 ("It was the [lower] court's view that the prior *answer* and not the unwarned questioning impaired respondent's ability to give a valid waiver...."). In addition, the two doctrines operate differently; the "fruit of the poisonous tree" doctrine excludes subsequent confessions, whether voluntary or not, except where the "taint" produced by the unlawful police conduct is dissipated, while the "cat out of the bag" rule calls into question the voluntariness of the subsequent confessions themselves.

**14.** In footnote 3 of the majority opinion in *Elstad*, the Supreme Court described as "inapposite ... the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were *flatly ignored* while police subjected them to continued interrogation." *Id.* at —— n. 3, 105 S.Ct. at 1296 n. 3 (emphasis added). Read in conjunction with the rest of the *Elstad* opinion, the meaning of footnote 3 is clear: where the police "flatly ignore" a suspect's invocation of rights, any confession obtained thereby is likely to be involuntary. Hence, in such cases, the "cat out of the bag" psychological effect may call into question the voluntariness of a subsequent confession.

Here, on the other hand, Martin never explicitly refused to answer any more questions. *See supra* note 13. We therefore cannot say that Martin's request to cut off questioning was "flatly ignored," and we already have held that Martin's July 4 confession was voluntary. In our view, the "technical" *Miranda* violation committed by the police in the instant case was no more likely to render a subsequent confession involuntary than was the "technical" failure to administer the *Miranda* warnings in *Elstad.*

rulings concerning the July 4 confession, we next turn to Martin's contention that the July 11 confession itself was obtained in violation of *Miranda,* in that the police who questioned him on that date did not fully rewarn him of all of his *Miranda* rights. A tape recording of the July 11 interrogation shows that, at the beginning of the interrogation, Detective Glover told Martin:[15]

Q. All right, Lee. I will remind you of your constitutional rights. You know that you don't have to talk to me. You have an attorney who says that he wishes for you to talk to no one but you're going to talk to me of your own free will and because you want to, is that correct?

A. Right.

Glover testified at the suppression hearing that Martin received no other warnings before the start of the interrogation, and that the only time Glover fully warned Martin was one week earlier, on July 4.[16]

Although providing Martin with full *Miranda* warnings on July 11 undoubtedly would have been a better and safer course, we cannot say that Glover's failure to rewarn Martin renders the confession inadmissible under *Miranda.* This circuit's predecessor faced an analogous situation in *Biddy v. Diamond,* 516 F.2d 118 (5th Cir. 1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976). There, the petitioner received full *Miranda* warnings on December 15. On December 27, the police again questioned her, this time merely asking, "do you understand your rights?" The petitioner replied that she did. On appeal, the court stated:

> The question is whether the full *Miranda* warnings were required on December 27 and 28, even though in response to the police question petitioner expressly stated that she remembered her rights as previously explained to her. We think not. We have previously held that "there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." *United States v. Anthony,* 474 F.2d 770, 773 (5th Cir.1973) ....
>
> We think that a further delineation on December 27 of petitioner's rights, which she had stated that she understood from prior explanations, would have been needlessly repetitious.

*Id.* at 122; *see also California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981) ("This court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant .... Quite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures.").

■ In our view, *Biddy* controls this issue.[17] Martin was fully warned, and knowingly and intelligently waived his *Miranda* rights, prior to the July 4 interrogation. On July 11, Martin indicated that he still understood those rights. As in *Biddy,* giving complete *Miranda* warnings on July 11

---

**15.** The quoted language is taken from the trial transcript. The version of the exchange that appears in the transcript of the suppression hearing differs slightly:

Q. All right. Lee, I will remind you of your constitutional rights. You know you don't have to talk until you have an attorney if you are going to talk to me, is that correct?
A. Right.

The slight differences between these two versions do not affect our resolution of this issue.

**16.** Glover contradicted this testimony at another point during the suppression hearing, when he stated that he also fully warned Martin of his *Miranda* rights prior to interrogating him on June 26. Glover produced at the hearing a "rights card" signed by Martin on that date.

**17.** Martin argues that the Supreme Court's decision in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), limited the relevant portions of *Biddy. Williams,* however, involved a completely different issue from the one presented here. In *Williams,* the issue was whether a waiver of the rights to remain silent and to have counsel present during questioning could be inferred from the fact that the suspect made incriminating statements in the absence of counsel. Although *Williams* may have cast doubt on the validity of *Biddy's* conclusion that such a waiver may be inferred, *see United States v. Brown,* 569 F.2d 236, 246 n. 12 (5th Cir.1978) (*en banc*), it did not call into question the portions of the *Biddy* opinion relied upon here.

would have been needlessly repetitious. We conclude that the July 11 confession was not obtained in violation of *Miranda.*

### E. The Right to Counsel and the July 11 Confession

Martin's next claim is that the July 11 confession was obtained in violation of his Sixth Amendment right to counsel. It is undisputed that Martin was represented by counsel,[18] and that counsel had instructed both Martin and the personnel at the jail that Martin was not to make any statements to police without counsel's permission. Despite these admonitions, however, Martin sent the captain of the jail a note requesting to speak with Christie Dietert, his parole supervisor, and Detective Glover. The captain reminded Martin that his lawyer did not want him to speak with anyone without the lawyer's permission, to which Martin replied that he knew. The captain wrote at the bottom of Martin's note, "has been told that his attorney, I guess, doesn't want him to talk to anyone," and both Martin and the captain signed the note. Martin told the captain that he still wanted to see Dietert and Glover. At Martin's request, the captain first tried to reach Dietert. When she could not be located, the captain telephoned Glover. Martin told Glover that he wanted to see him.

Meanwhile, Dietert was notified of Martin's request and came to the jail to speak with him. During this conversation, which took place in an office at the jail, Martin physically assaulted Dietert in an attempt to take her as a hostage.[19] The jail guards burst into the room and forcibly subdued Martin, leaving him with a gash on his forehead.[20] Martin then was taken to a small holding cell, where, a few moments later, Detective Glover met with him and took his second confession to the Patricia Greenfield murder.

Martin concedes that a defendant may waive the Sixth Amendment right to counsel. Martin notes, however, that the state has the heavy burden of establishing "an intentional relinquishment or abandonment of a known right or privilege." *Hance v. Zant,* 696 F.2d 940, 947 (11th Cir.) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1938)), *cert. denied,* — U.S. —, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *accord, United States v. Brown,* 569 F.2d 236 (5th Cir. 1978) (*en banc*). Furthermore, as Martin points out, courts must "indulge in every reasonable presumption against waiver." *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *accord, Tinsley v. Purvis,* 731 F.2d 791, 794 (11th Cir.1984). The ultimate determination of waiver turns on the totality of the circumstances. *See id.* at 793; *Sullivan v. Alabama,* 666 F.2d 478, 483 (11th Cir.1982).

We find that the state has met its burden in this case. Martin initiated the July 11 conversation with the police, despite being warned by his counsel and by the jail captain not to do so. Even after reading and signing a note indicating that he had been informed of his counsel's wishes, Martin continued to press his request to speak with Dietert and with Detective Glover. These actions clearly evidence Martin's intent to waive his right to counsel. *See Sullivan,* 666 F.2d at 483 (waiver need not be explicit, but may be inferred from totality of circumstances). Martin was not in any way coerced into making this decision.

Martin argues, however, that (1) his motive for wishing to speak with the police was suicidal, not rational, (2) his waiver, if it existed, became ineffective after he attacked Christie Dietert, and (3) he was not informed of his *Miranda* rights

---

18. After Martin's July 4 arrest on charges unrelated to the Greenfield murder, *see supra* note 2, the public defender's office was appointed to represent him. On or about July 7, attorney Richard Lubin was substituted as Martin's defense counsel.

19. Martin later told Detective Glover that he wanted to use Dietert as "leverage" to "get a gun and commit suicide."

20. Although the record is unclear on the point, it appears that Martin later was taken to a hospital where he received several stitches.

prior to the alleged waiver. We find these arguments meritless. Martin's motive for waiving his right to counsel is irrelevant as to whether such a waiver was made,[21] Martin's unprovoked attack on Dietert did not vitiate or terminate the otherwise valid waiver, and the jail captain clearly informed Martin that he did not have to, and had been advised not to, speak to the police outside of his counsel's presence. We also note that Detective Glover reminded Martin of his *Miranda* rights after the attack on Dietert, but prior to the confession.

As the trial court observed, "A lawyer can give advice but he cannot oblige his client to follow it." We agree with the trial court that the state met its burden of proving that Martin intentionally relinquished his right to counsel prior to the July 11 interrogation, and we hold that the July 11 confession was not obtained in violation of Martin's right to counsel.

### F. Voluntariness and the July 11 Confession

■ Martin's final claim with respect to the July 11 confession is that it was involuntary. We do not agree. The only indicia of coercion identified by Martin in connection with the July 11 interrogation are (1) his physical condition following his aborted attack on Christie Dietert, and (2) the fact that Detective Glover failed to give him complete *Miranda* warnings. Although the jail guards forcibly subdued Martin after he attacked Dietert, leaving him with a gash on his forehead,[22] such force was not intended, nor could Martin possibly have believed that it was intended, to coerce him into confessing for a second time to the Greenfield murder. In addition, the state trial court found that Martin made "no complaint of his injuries or mental condi-

tion," and that "[t]he voices [on the tape recording] reflect the same indicia of voluntariness described in the earlier [July 4] statement." Finally, with respect to the incomplete *Miranda* warnings, we already have concluded that such warnings were adequate, under the circumstances of this case, to remind Martin of his rights. We hold that the July 11 confession was voluntary and, therefore, admissible at Martin's trial.

### G. Harmless Error

To summarize, the July 4 confession, although voluntary, was obtained in violation of *Miranda* and hence inadmissible. Under *Elstad*, however, neither the July 4 *Miranda* violation nor the fact that Martin had "let the cat out of the bag" rendered the July 11 confession inadmissible. Rather, the July 11 confession, having been obtained without coercion and in full compliance with both *Miranda* and the Sixth Amendment right to counsel, properly was admitted at trial. We now must determine whether Martin is entitled to reversal of his murder conviction, or whether the erroneous admission of the July 4 confession was "harmless error" under the test set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[23]

■ After reviewing the entire record, we are convinced beyond a reasonable doubt that the erroneous admission of Martin's July 4 confession could not have contributed to his murder conviction. The most important factor in our decision is that the July 4 confession was merely cumulative of the evidence contained in the July 11 confession. In fact, the July 11 confession included a far more detailed description of the murder than did the July 4 confession.[24]

---

21. We note that Martin never attempted to explicitly limit the scope of his waiver of the right to counsel. We thus need not address such questions as whether a suspect may make a "limited" waiver of the right to counsel, and under what circumstances the police might be held to have violated such a "limited" waiver.

22. *See supra* note 21.

23. The *Chapman* "harmless error" standard requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24, 87 S.Ct. at 828.

24. In the July 4 confession, Martin never described the murder itself, but merely admitted, "I killed her." In the July 11 confession, on the other hand, Martin identified the knife he used

Moreover, in addition to the July 11 confession, the jury had before it the testimony of Martin's accomplice, Gary Forbes, who gave a lengthy account of the robbery, kidnapping, and sexual battery of Patricia Greenfield, and who told the jury how Martin, armed with a knife, led the blindfolded young woman down a dirt road at the Lantana Dump and returned fifteen or twenty minutes later, saying that he had killed Greenfield by stabbing her in the throat. Finally, the jury was presented with the unrebutted testimony of a state pathologist, who examined Greenfield's body and found the cause of her death to be the multiple stab wounds in the throat.

Martin argues, however, that his involvement in the murder was not the only crucial issue at trial. According to Martin, the erroneous admission of his July 4 confession was "harmful" because the jury and the sentencing judge relied on it as evidence of Martin's sanity. We disagree. The July 4 confession was, again, merely cumulative of the other evidence presented on this issue. This is apparent from the state trial court's sentencing order, in which the court explained that it rejected Martin's claims of insanity, mental or emotional disturbance, and diminished capacity on the basis of the following evidence: (1) "[T]he testimony of the professional witnesses," (2) "The testimony of the non-professionals who have observed the defendant before and during his incarceration," (3) "The actions of the defendant prior to his arrest, during his confinement and dur-

ing his court appearances," and, finally, (4) "the statements of the defendant to the police, and others, concerning the criminal charges." [25] In light of all of this evidence, we see no possibility, let alone a reasonable one, that absent the July 4 confession either the jury or the sentencing judge would have found Martin insane.

In conclusion, we hold that the erroneous admission of the July 4 confession was harmless beyond a reasonable doubt as to both Martin's guilt and his sanity. We therefore decline to reverse Martin's murder conviction on this ground.[26]

## III. THE *AKE V. OKLAHOMA* ISSUE

Martin next contends that the state trial court committed constitutional error by refusing to appoint an additional mental health expert to assist his defense. Martin was examined prior to trial by seven mental health experts, including four psychiatrists, two psychologists, and a neurologist, all of whom were either court-appointed or recruited by the defense. Martin asserts, however, that in addition to these seven experts the court also should have appointed Dr. Theodore Blau, a neuropsychologist, to examine him for organic brain damage. Martin claims that he was deprived of Dr. Blau's assistance solely due to his indigency, thus denying him due process of law.

Martin's claim is analogous to the one recently addressed by the Supreme Court in *Ake v. Oklahoma,* ⸺ U.S. ⸺, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake,* the trial court denied a timely defense re-

---

to commit the murder and the specific location at the Lantana Dump where the murder took place. He also stated:

> I took Patty down behind an embankment in the Lantana Dump. I stabbed her in the neck once and left her. I at first tried to strangle her. I couldn't get her to become unconscious with the rope that Gary gave me. Then Gary heard a couple of shots. He backed the car up and I heard the shots also and that was when I stabbed her in the neck.

**25.** The sentencing order also indicated that, rather than the state relying on the two confessions as evidence of Martin's *sanity,* Martin relied on them as evidence of his *insanity.*

**26.** Martin did not raise on appeal the possible effect of the erroneous admission of the July 4 confession on his capital sentencing proceeding, nor would raising the issue require reversal of Martin's death sentence. Ample evidence was introduced at sentencing, independent of the July 4 confession, to support all five of the aggravating factors found by the jury. *See Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir. 1985) ("[Mitchell] contends that the district court should have held an evidentiary hearing on the voluntariness of Mitchell's confession. Because we have concluded ... that the State produced sufficient evidence on aggravating factors of Mitchell's offenses in the absence of Mitchell's confessions, this claim is without merit.").

quest for a court-appointed psychiatrist. As a result, the defendant was examined only by state psychiatrists, whose testimony was instrumental in establishing both the defendant's sanity at the time of the offense and his future dangerousness. The defendant was convicted of first-degree murder and sentenced to death, and the conviction and sentence were affirmed by the state appellate court.

The Supreme Court, however, reversed. The Court emphasized that "justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Id.* at ——, 105 S.Ct. at 1093. After noting the significant role psychiatric evaluations play in many criminal trials, the Court concluded that "without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high." *Id.* at ——, 105 S.Ct. at 1096. The Court then held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to

hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed....

*Id.* at ——, 105 S.Ct. at 1097. The *Ake* Court applied the same rule to capital sentencing proceedings in which the state presents psychiatric evidence as to the defendant's future dangerousness. *See id.*

In our view, *Ake* provides no solace to the petitioner in this case. As noted above, Martin was examined by seven mental health experts, none of whom were hired by the state. On the contrary, all seven were either appointed by the court, with the approval of both the prosecutor and defense counsel, or were recruited by the defense. Furthermore, two of the experts significantly assisted Martin's defense by testifying at trial that Martin was insane at the time the murder was committed. In short, Martin simply was not denied the "access to a competent psychiatrist" guaranteed to indigent defendants by *Ake.*

Martin contends, however, that only one of the experts, namely, Dr. Russell Wilson, the neurologist, ever examined him for organic brain damage, and that the other six experts merely relied on Dr. Wilson's conclusion that Martin was not organically brain-damaged. According to Martin, this conclusion was erroneous, and would have been rebutted by Dr. Blau.[27]

We reject this contention as well. Martin does not claim that Dr. Wilson was incompetent or biased.[28] Instead, Martin's contention seems based on a theory that he was constitutionally entitled to the appointment of an expert who would agree to testify in accordance with his wishes. This

---

**27.** On appeal from the denial of Martin's Rule 3.850 motion for post-conviction relief, the Supreme Court of Florida concluded:

> Martin's claim that the unappointed expert would have completely undermined the neurologist's findings and the testimony based on those findings is purely speculative. At best this expert's testimony would have given the jury and judge one more bit of information to be considered and weighed along with the other experts' testimony and the proof that Martin was, at best, a murderer and rapist

who committed the instant crime while on parole.

*Martin v. State,* 455 So.2d 370, 372 (Fla.1984). Because we reject Martin's claim on another ground, we need not decide whether the claim was, as the Supreme Court of Florida stated, "purely speculative."

**28.** Nor would a claim of bias likely be well received by this court, since the services of Dr. Wilson were sought by defense counsel.

court rejected just such a contention in *Finney v. Zant,* 709 F.2d 643 (11th Cir. 1983):

> Finney does not contend the court-appointed psychiatrists were biased. His contention that their examinations should have been more thorough and that their conclusions were inaccurate is the sort of argument that should be addressed to the finder of fact....
>
> ... [T]he accused was entitled to an impartial assessment of his mental condition but not to a battery of experts. [*McGarty v. O'Brien,* 188 F.2d 151,] 157 [ (1st Cir.), *cert. denied,* 341 U.S. 928, 71 S.Ct. 794, 95 L.Ed.2d 1359 (1951) ]. *Accord, Satterfield v. Zahradnick,* 572 F.2d 443, 445 (4th Cir.), *cert. denied,* 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978).

*Id.* at 645.

Moreover, nothing in *Ake* even suggests that a defendant is constitutionally entitled to a *favorable* psychiatric opinion. Rather, the Court's discussion in *Ake* focused on the need for a competent, *independent* psychiatrist to assist in the "evaluation, preparation, and presentation of the defense." —— U.S. at ——, 105 S.Ct. at 1097; *cf. Blake v. Kemp,* 758 F.2d 523, 529 (11th Cir.1985) (court found it "important to note" that case before it did *not* involve "the right of a defendant to ask for successive appointments at state expense of psychiatrists in order to obtain the kind of report that would be favorable to him.").

■■■■■ We hold that the examination of Martin by seven independent or defense-recruited mental health experts more than adequately met the requirements of *Ake.* With respect to the issue of organic brain damage, we reject the notion that either *Ake* or the due process clause requires the appointment of an expert who would reach a conclusion favorable to the defendant, and hold that the examination conducted by Dr. Wilson, an independent and presumably competent neurologist, met minimum constitutional standards.[29] Because the trial court's refusal to appoint an additional mental health expert did not deny Martin "the opportunity to participate meaningfully" in the trial or sentencing proceeding, we decline to reverse Martin's conviction or sentence on this ground.[30]

## IV. THE EXCLUSION OF EVIDENCE CONCERNING THE DETERRENT EFFECT OF THE DEATH PENALTY

Martin alleges that the state trial court violated *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), by excluding or refusing to consider, at sentencing, certain evidence concerning the deterrent effect of the death penalty. The evidence consisted of the testimony of law professor Hans Zeisel of the University of Chicago, who sought to tell the jury that (1) in general, the death penalty has no proven deterrent effect, and (2) in particular, the death penalty does not deter the mentally ill. The trial court allowed Zeisel to testify concerning the alleged lack of general deterrent effect, but refused to permit testimony concerning the deterrent effect on the mentally ill. The court then instructed the jury:

> During this phase of the trial I have permitted some testimony by a professor having to do with the question of whether or not the death penalty deters. You are instructed that the determination of whether or not one state has such a

---

**29.** Martin also contends that Dr. Wilson's examination was insufficient because he was a *neurologist,* whereas Dr. Blau was a *neuropsychologist.* Martin concedes, however, that both of these disciplines involve the study of behavior as "a manifestation of measurable brain dysfunction." We reject as patently untenable the suggestion that the trial court committed error of constitutional dimensions by refusing to appoint a neuropsychologist, as opposed to a neurologist.

**30.** Because we find that Martin was not entitled, on the facts of this case, to the services of an additional mental health expert, we need not address whether Martin sufficiently demonstrated to the trial court the reasonableness of his request. *See Caldwell v. Mississippi,* —— U.S. ——, —— n. 1, 105 S.Ct. 2633, n. 1, 86 L.Ed.2d 231 (1985) (rejecting *Ake* claim because no showing of reasonableness had been made in trial court).

penalty is the exclusive prerogative of the people of that state as reflected in their legislative action.

It is the duty of judges, lawyers and juries to follow such legislative enactments as long as they are constitutional. The jury recommended the death penalty, and the court, presumably following its own instructions and refusing to consider Zeisel's testimony on deterrence, sentenced Martin to death.

We hold that the trial court did not violate *Lockett.* Both *Lockett* and its sequel, *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), require the admission and consideration at sentencing of all evidence relating to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings,* 455 U.S. at 110, 102 S.Ct. at 874; *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964; *accord, Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) ("[T]he fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

Evidence such as that introduced or proffered in the instant case, however, fundamentally differs from that involved in *Lockett* and *Eddings.* Evidence concerning whether the death penalty has a deter-

rent effect, either on potential murderers in general or on a specific category of potential murderers, is *not* designed to help the sentencer focus on the unique characteristics of a particular capital defendant or crime.[31] Rather, such evidence is designed to persuade the sentencer that the legislature erred, in whole or in part, when it enacted a death penalty statute.[32] Such evidence has never been held, either by the Supreme Court or by this court, to be "constitutionally indispensable." As the Supreme Court noted in *Lockett:*

> Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense

438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12.

In *Shriner v. Wainwright,* 715 F.2d 1452 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984), this court considered and rejected an argument extremely similar to Martin's. There, the petitioner unsuccessfully sought to introduce at sentencing the testimony of a Methodist minister who had witnessed three electrocutions. The obvious purpose of the testimony was to persuade the jury and sentencing court that the legislature had erred when it enacted a statute authorizing the imposition of the death penalty through electrocution. The petitioner argued on appeal that the exclusion of the minister's testimony denied the jury evidence relevant to "evolving standards of

---

**31.** Martin argues that Zeisel's proffered testimony relating to the alleged lack of deterrent effect on the mentally ill was "tailored to the facts and circumstances" of his case. We disagree. Zeisel's testimony had nothing to do with Martin's personal characteristics or background.

Even if Zeisel's proffered testimony *had* been "tailored to the facts and circumstances" of Martin's case, however, its relevance still would have been doubtful. The gist of Zeisel's testimony was that mentally ill murderers should not be given the death penalty because other mentally ill persons will not thereby be deterred from committing murders. The death penalty, however, is not imposed solely to deter persons similar to the person executed. Rather, the death penalty is imposed to deter *all* potential

murderers. The relevant issue, therefore, is not whether the execution of mentally ill murderers will deter other mentally ill persons from committing murders, but whether it will deter *anyone* from doing so.

**32.** Evidence concerning whether the death penalty has a deterrent effect on potential murderers in general is designed to persuade the sentencer that the legislature erred when it enacted a death penalty statute. Evidence concerning whether the death penalty deters a specific category of potential murderers, to the extent it is relevant at all, *see supra* note 32, is designed to show that the legislature should have provided an exemption from the death penalty for such persons.

decency," *see Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1776 n. 15, 20 L.Ed.2d 776 (1968) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)), and thus contravened *Lockett.* This court held:

> Shriner misreads *Lockett.* While the plurality opinion indicated that a defendant in a capital case must be permitted to introduce virtually any evidence relating to his character, record or offense, *it did not hold that all evidence proffered by the defendant concerning the propriety of electrocutions in general must be admitted.*

*Id.* at 1456 (emphasis added). In our view, the *Shriner* rationale also applies to evidence of deterrence such as that introduced or proffered by Martin.

Martin contends, however, that our decision in *Collins v. Francis*, 728 F.2d 1322 (11th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984), compels a different result. In *Collins*, the prosecutor made the following remark during the closing arguments in a capital sentencing proceeding:

> Now arguments have been put forth against capital punishment in that it does not deter crime. But that argument cannot be supported by statistics or anything else.

*Id.* at 1338–39. We rejected the petitioner's argument that "the need for general deterrence is an unconstitutional sentencing consideration," *id.* at 1340, and held that "[t]he U.S. Constitution does not forbid a sentencer to hear argument from counsel on the need for a deterrent sentence and to fashion a sentence to satisfy that need." *Id.* at 1339 (footnote omitted). Our decision was based on a determination

that the prosecutor's remark was not "so egregious as to render the [sentencing proceeding] fundamentally unfair." *Id.* at 1338 (quoting *Hance v. Zant*, 696 F.2d 940, 951 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983)).

▉ That a prosecutor or defense attorney may argue deterrence during a capital sentencing proceeding without offending the Due Process Clause, however, does *not* mean that the Eighth Amendment prohibits the exclusion of evidence relating to deterrence. As we already have noted, neither *Lockett* nor *Eddings* suggests that the Eighth Amendment reaches that far.[33] It may seem anomalous for a state to permit argument on a subject yet, at the same time, exclude evidence relating to that subject. Nevertheless, neither the Eighth Amendment nor any other part of the Constitution prevents a state from doing so. We hold, therefore, that Martin is not entitled to a new sentencing proceeding because of the state trial court's exclusion of, or failure to consider, evidence relating to the deterrent effect of the death penalty.[34]

## V. THE REMAINING CLAIMS OF ERROR

Martin's three remaining claims of error do not merit extended discussion. First, he argues that the trial court erred by excluding, at trial and at sentencing, certain jail records. According to Martin, these records were relevant to his insanity defense at trial, and to the existence of mitigating factors at sentencing, because they showed (1) that he was "tremulous" while in jail, thus indicating that he did not "fake" his tremors during his psychiatric examinations, (2) that he attempted to commit suicide while in jail, and (3) the dosages

---

**33.** Nor is the admissibility of evidence concerning the deterrent effect of the death penalty an issue in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (*en banc*); see Order on Petition for Rehearing, July 23, 1985, slip op. at 5700.

**34.** Martin also contends that the jury instructions quoted above may have misled the jury into believing it could not even consider deterrence, or the lack thereof, in determining

whether to recommend the death penalty. We do not find the instructions ambiguous, nor do we believe that the jury could have found them so. The instructions clearly and correctly reminded the jury that the wisdom of the legislature's decision to enact a death penalty statute was not properly before it, despite Zeisel's testimony challenging the deterrence rationale behind that decision.

of antipsychotic medication given to him, as prescribed by Dr. Vaughn.

▆ Even assuming the jail records should have been admitted at trial, however, such error hardly was of constitutional dimension. *See Dickson v. Wainwright,* 683 F.2d 348, 350 (11th Cir.1982) ("An evidentiary error does not justify habeas relief unless the violation results in a denial of fundamental fairness."); *Anderson v. Maggio,* 555 F.2d 447, 451 (5th Cir.1977) (evidentiary error justifies habeas relief only if "material in the sense of a crucial, critical, highly significant factor."). The records would have been merely cumulative evidence on the subject of Martin's mental condition, a subject already explored in great detail throughout the trial. Furthermore, Dr. Vaughn, as Martin's psychiatrist, could have testified about the antipsychotic medication.

▆ So far as the sentencing proceeding is concerned, our review of the transcript indicates that the trial court did not exclude the jail records. Rather, the court told defense counsel that the records could be introduced into evidence, but only if all of the records went in, including those relating to Martin's attack on Christie Dietert. Defense counsel then decided not to introduce any of the records. In our view, the court's ruling was absolutely correct. *Lockett* entitles a capital defendant to introduce all relevant mitigating evidence at sentencing, but does not entitle the defendant to pick and choose between portions of documents and records in an attempt to mislead the sentencer. *Cf.* Fla.Stat. § 90.-108 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered

contemporaneously."); *accord,* Fed.R.Evid. 106.[35]

Martin's second remaining claim is that his Sixth Amendment right of confrontation was violated by the admission at sentencing, without a prior showing of unavailability, of the pretrial deposition of Dr. Scherer, one of the psychiatrists who examined Martin. The problem with this claim is that defense counsel never objected to the admission of the deposition on the grounds that the state had failed to establish Dr. Scherer's unavailability. "In the absence of plain error, hearsay that is not properly objected to is ordinarily admissible at trial for any relevant purpose and may be considered by the jury to the extent of its probative value." *United States v. Phillips,* 664 F.2d 971, 1026 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 459 U.S. 906, 102 S.Ct. 2965, 103 S.Ct. 208, 73 L.Ed.2d 1354, 74 L.Ed.2d 166 (1982).[36] We find that the admission of Dr. Scherer's deposition did not constitute "plain error," and thus reject Martin's confrontation clause argument.

Martin's final remaining claim is that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the use of a death-qualified jury at trial. Martin cites in support of his claim the recent Eighth Circuit decision in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985). This court, however, has rejected on several occasions claims identical to Martin's. *See Jenkins v. Wainwright,* 763 F.2d 1390, 1393 (11th Cir.1985); *Smith v. Balkcom,* 660 F.2d 573, 575–84 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858 (5th Cir. Unit B), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 591–99 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). We abide by the controlling precedent.

---

**35.** Prior to trial, the jail records apparently had been photocopied onto a single sheet of paper, although they initially consisted of a number of separate cards. Our resolution of this issue, however, depends not on the number of sheets of paper involved, but on the fact that the various portions of the records were related in content and, in the words of the relevant state

evidence rule, "in fairness ought to be considered contemporaneously."

**36.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

## VI. CONCLUSION

On the basis of the foregoing discussion, the judgment of the court below denying Martin's petition for a writ of habeas corpus is hereby AFFIRMED.

HATCHETT, Circuit Judge, concurring in part and dissenting in part:

I dissent from that portion of the majority's opinion that holds that evidence relative to general deterrence may not be introduced in the penalty phase of a capital offense trial.

With the filing of this opinion, the Eleventh Circuit's cases on the subject of general deterrence hold (1) that neither the prosecutor nor defense counsel may put into evidence facts relevant to whether the death penalty provides general deterrence to murder, but (2) that both the prosecutor and the defense counsel may argue to the jury the merits or demerits of the death penalty as a deterrent. *Collins v. Francis,* 728 F.2d 1322 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). Sounds fair enough; but, in reality, such holdings render any defense counsel's argument about general deterrence totally ineffective.

The defense and the prosecution, as in this case, are prohibited from introducing evidence of the deterrent effect of the death penalty, but the prosecutor is not at an equal disadvantage under this rule of exclusion. The prosecutor can argue general deterrence, using the existence of the legislative enactment, the capital sentencing statute, as evidentiary support. Further, the prosecutor's argument of general deterrence is benefited by jury instructions which caution the jury not to consider the general deterrence issue, but to "follow such legislative enactments" as the capital sentencing statute under which the jury is impaneled. The prosecutor is able, therefore, to get before the jury the existence of the view of the enacting legislators and the trial judge's declaration that the capital sentencing statute has conclusively resolved the general deterrence issue. The prosecutor's argument, legitimized by the existence of the legislative enactment and by the trial judge's instruction, has the impact of *credible evidence.* An argument with such impact cannot be successfully rebutted by defense counsel's argument against imposition of the death sentence.

In this case, the unfairness was increased when the trial judge admitted the out-of-state professor's testimony and then, in effect, instructed the jury to ignore the testimony because "whether or not one state has such a penalty is the exclusive prerogative of the people of that state...."

Florida law allows the prosecutor the broadest latitude in arguing to the jury. Even "inflammatory" or "abusive argument" is allowed where "there is ample basis in the record to support the remarks." *Darden v. State,* 329 So.2d 287, 291 (Fla.1976). In the sentencing phase of a capital offense prosecution, "evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant." Fla.Stat.Ann. § 921.141(1) (West 1985). A prosecutor's argument in the sentencing proceeding that the jury should recommend the death penalty as a deterrent to crime has been approved by Florida law. *Gibson v. State,* 351 So.2d 948, 950 (Fla.1977) (citing *Darden v. State,* 329 So.2d 287 (Fla. 1976)). Florida may well cure this problem by allowing the introduction of general deterrence evidence. In any event, this court must face the federal constitutional question presented as a result of our holdings.

The present anomaly is of constitutional proportions making fundamentally unfair the capital sentencing proceeding. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To put an end to this anomaly, it is time for the en banc court to hold that no arguments may be made to the jury about the deterrent effect of the death penalty, or to hold that such arguments may only be made based on evidence presented before the jury.