# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-00748-COA

**JOSHUA TAYLOR A/K/A JOSHUA MIQUEL TAYLOR A/K/A JOSHUA M. TAYLOR**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/21/2017 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ERIN ELIZABETH BRIGGS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KAYLYN HAVRILLA McCLINTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/15/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., TINDELL AND LAWRENCE, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     On July 26, 2011, a Lowndes County jury convicted Joshua Taylor of one count of capital murder for the death of William Stallings. Taylor appeals his conviction, asserting that the circuit court erroneously refused to give a lesser-included-offense jury instruction for second-degree murder and erroneously denied his motion to suppress statements he made to investigating officers. Because we find that Taylor's claims lack merit, we affirm his conviction and sentence.

## FACTS

¶2.    On the night of May 19, 2011, Stallings went to visit his friend Michael Love.  Love lived with his mother, Shirley, and his two siblings in a home in Lowndes County.  Both of Love's siblings were out of town at the time.  Stallings and Love went to sleep around 1 a.m.

¶3.    Around 3 a.m., Love awoke to a loud banging on the front door.  At first, Love assumed the sound was his siblings returning home.  But when he went to inspect the noise, he found the front door wide open.  Love exited the house but then heard a gunshot.  Fearing for his safety, he ran into the woods and called 9-1-1.

¶4.    Around the same time, Shirley heard "a big boom" and assumed her son had returned home.  She opened her bedroom door to look but instead saw several men she did not recognize as well as part of a gun.  Shirley slammed her door shut and fell to the floor.  Shirley testified she then heard a gunshot before the men forcibly entered her room and rummaged through her purse.  Afraid, Shirley began crying and praying.  The men told her to shut up before finally leaving.  A few minutes later, she heard another gunshot and remained on her bedroom floor until Love returned to the trailer.  After Love returned, he and Shirley found Stallings dead due to a gunshot wound to the head.

¶5.    Investigator Eli Perrigin, a member of the Lowndes County Sheriff's Department, investigated the shooting.  After following up on several leads, Perrigin made multiple arrests in connection with the incident.  After making these arrests, Perrigin soon received a call from an Alabama citizen who wished to speak about the investigation.  The call came from Lacee Cox, Taylor's girlfriend of over a year.  Fearing that the police had arrested the wrong suspects, Cox called to inform them about Taylor's activities on the night in question.  Cox

also gave Perrigrin Taylor's name as well as the names of Brandon Brown, Richard Lee, Johnny Brock, and Cameron Merriweather.

¶6.    Perrigin decided to investigate the information Cox provided and first questioned Merriweather about the night in question.  Merriweather provided information that led Perrigin to the remaining men, including Taylor.  Brown, Lee, and Brock all gave similar statements to the police regarding the incident.

¶7.    Perrigin first interviewed Taylor on May 27, 2011.  Taylor received and signed a *Miranda*[1] waiver after Perrigin read Taylor his rights. This first interview was recorded, but the recording has subsequently been lost.  Perrigin did, however, write a narrative of the interview in which Taylor initially denied any involvement in the incident but later confessed that he had gone to Mississippi with his friends on the night of the incident.  Taylor still denied being involved with the break-in of the Loves' home or Stallings's death.

¶8.    Perrigin spoke to Taylor a second time on the same day, May 27, 2011.  This interview is the subject of Taylor's motion to suppress that the circuit court denied.  In this interview, Taylor again signed a *Miranda* waiver after he was read his rights.  On two occasions during this interview, Taylor indicated that he did not wish to talk about the incident anymore, but he never indicated that he wished for an attorney to be present.  The investigators continued the interrogation, believing that they were authorized to do so based upon Taylor's actions.  Taylor continued his conversation with the officers and within minutes admitted that he was the one who shot Stallings.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶9. The following day, Taylor accompanied police to the site of the incident to help them find the discarded gun. Despite their best efforts, however, investigators were unable to find the gun used. Perrigin spoke to Taylor one final time on June 2, 2011. Unlike his prior interviews, Taylor initiated this interview himself. Taylor confessed that he felt bad for what he had done and that he and Merriweather were the only ones who should be charged with murder.

¶10. At trial, Cox, Brown, Lee, and Brock all testified against Taylor. Cox testified that on the night in question, she overheard Taylor, Brown, and Lee talking about going to "hit a lick," which Cox interpreted as "doing something that they didn't need to be doing." Taylor dropped Cox off at work and later drove her 1999 Crown Victoria to pick up his friends. When confronted by Cox the next day, Taylor admitted he and his friends had been at a house when one of his friends kicked in a door. Cox also told the police that Taylor initially admitted to shooting Stallings while he was asleep on the couch. Taylor later stated that he did not participate in the shooting, and from that point on, Taylor gave Cox conflicting stories by admitting to the murder and then denying participation.

¶11. Brown, Lee, and Brock all presented similar accounts to the jury of what happened on the night of Stallings's murder. Taylor and the other men all decided to cross the Alabama-Mississippi state line to purchase alcohol and drugs at a convenience store. However, instead of going to the store, Taylor drove the group to Love's house, where the group believed they would purchase the marijuana. Merriweather was the first to exit the car and knock on the door, but he received no answer. Merriweather then suggested moving the

4

car out of sight because the design was similar to that of a police vehicle. After Taylor moved the car, he and Merriweather went back to the door. Brown, Lee, and Brock stood by the car at this time.

¶12. Brown testified that after a while, he and the others went to check on Taylor and Merriweather because they had been gone awhile. Once Brown and the others had approached the home, Brown stated that he saw Merriweather fire the gun at Shirley. After Merriweather shot the gun, Taylor took the gun from him and proceeded down the hallway toward Love's room. Brown testified that he, Lee, and Brock all left the home and walked back to the car. Later, the men heard a second gunshot and saw Merriweather and Taylor running from the house. The three men all testified that Taylor admitted to the group that he had shot Stallings and demanded they all keep quiet about that night.

¶13. Taylor argued at trial that his confession to Perrigrin was not voluntary because he had invoked his right to remain silent twice, yet investigators ignored it. Taylor also requested jury instructions for the lesser-included offenses of first- and second-degree murder. The circuit court gave an instruction for first-degree murder but refused to give an instruction for the lesser-included offense of second-degree murder. The jury ultimately found Taylor guilty of one count of capital murder on July 26, 2011, and the circuit court sentenced him to life without eligibility for parole.

¶14. Aggrieved, Taylor now appeals his conviction and sentence.

**STANDARD OF REVIEW**

¶15. "We review a [circuit court's refusal to give] a lesser-included-offense jury instruction

5

de novo." *Smith v. State*, 171 So. 3d 542, 546 (¶9) (Miss. Ct. App. 2015).

¶16.    When we review a court's decision to deny a motion to suppress a confession,

> we apply the familiar general rule that since the court sits as the fact-finder
> when determining the issue of whether an accused's confession has been
> intelligently, knowingly, and voluntarily given, we will only reverse the court's
> determination of this issue when such determination is manifestly wrong.

*Keller v. State*, 138 So. 3d 817, 835 (¶16) (Miss. 2014). "[W]e will not disturb the court's

determination on the admissibility of a confession unless the court applied an incorrect legal

standard, committed manifest error, or rendered a decision which was contrary to the

overwhelming weight of the evidence." *Id*.

## DISCUSSION

### I.    Lesser-Included Offense

¶17.    Upon review, we find no error in the circuit court's refusal to give a jury instruction

on the lesser-included offense of second-degree murder.  A criminal defendant is entitled to

jury instructions supporting his theory of the case but only where sufficient evidence supports

such instructions. *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013).  The Mississippi

Supreme Court has held:

> Our law is well-settled that jury instructions are not given unless there is an
> evidentiary basis in the record for such. . . . To warrant the lesser-included-
> offense instruction, a defendant must point to some evidence in the record
> from which a *reasonable* jury could find him not guilty of the crime with
> which he was charged and at the same time find him guilty of a lesser-included
> offense.

*Goodnite v. State*, 799 So. 2d 64, 69 (¶24) (Miss. 2001) (citation omitted) (emphasis added).

Therefore, for a lesser-included-offense instruction to be appropriate, Taylor had to show

6

sufficient evidence that a reasonable jury could find him not guilty of capital murder but still find him guilty of second-degree murder. *See Smith*, 171 So. 3d at 546 (¶9). When determining the propriety of a lesser-included-offense instruction, "[w]e must view the evidence in the light most favorable to the defendant." *Gilmore*, 119 So. 3d at 286 (¶13). Also, "lesser-included-offense instructions should not be [given] on mere speculation." *Franklin v. State*, 136 So. 3d 1021, 1026-27 (¶11) (Miss. 2014). We will only reverse the circuit court's refusal to give a lesser-included-offense instruction in circumstances where an evidentiary basis for the instruction exists in the record. *Lee v. State*, 469 So. 2d 1225, 1230-31 (Miss. 1985).

¶18. Taylor was originally indicted for capital murder but now argues that he was entitled to a lesser-included-offense instruction for second-degree murder. Second-degree murder requires some evidence that the defendant killed the victim "in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although *without* any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-6-19(1)(b) (Supp. 2018) (emphasis added). Behavior constituting a depraved heart has been described as "conduct so gross as to be tantamount to a wanton disregard of, or utter indifference to, the safety of human life." *Nichols v. State*, 27 So. 3d 433, 440 (¶20) (Miss. Ct. App. 2009) (quoting *Montana v. State*, 822 So. 2d 954, 966-67 (¶55) (Miss. 2002)).

¶19. Capital murder, on the other hand, is defined as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with or without

any design to effect death, by any person engaged in the commission of . . . burglary. . . ." Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2018). Unlike simple murder and other categories of capital murder, the State is not required to prove malice to obtain a conviction for capital murder under section 97-3-19(2)(e). *Ronk v. State*, 172 So. 3d 1112, 1126 (¶23) (Miss. 2015). As long as a reasonable jury could find that the defendant was engaged in the commission of one of the underlying felonies listed in section 97-3-19(2)(e), which includes burglary, and the victim's death resulted, the defendant is guilty of capital murder. *See id*. at 1127, 1130 (¶¶25, 35) (citing *Jacobs v. State*, 870 So. 2d 1202, 1209 (Miss. 2004)). But if sufficient evidence is presented that separates the defendant from the underlying felony, the defendant may be entitled to lesser-included-offense instructions. *See id*. at 1127-28 (¶27). Therefore, to warrant a second-degree-murder instruction, Taylor would have had to point to some evidence in the record that separated him from the underlying felony of burglary associated with the killing.

¶20. As previously stated, the jury heard testimony from Taylor's girlfriend, Cox, Brown, Lee, and Brown. Lacee Cox testified that Taylor went to the trailer "to hit a lick" and that, after entering the trailer, Taylor shot a man who was lying on a couch. Brown, Lee, and Brock all testified similarly regarding the night of the crime. Each testified that the group went to the trailer to get marijuana. Taylor and Merriweather both knocked on the trailer door and then disappeared behind the trailer. Brown testified that, after hearing a gunshot, he went behind the trailer and saw that the door appeared to have been kicked open. Brandon then saw Taylor take a gun from Merriweather. Brown returned to the car with Lee and

8

Brock, and then the three men heard a second gunshot. They testified to seeing Taylor and Merriweather run out of the trailer after the second shot was fired, with Taylor still in possession of the gun. Taylor then told the men, "I shot a guy, I shot a guy," and for them not to speak to anyone about the incident. Merriweather testified only that he knew Taylor, Brown, Lee, and Brock and invoked his Fifth Amendment rights as a co-defendant to capital murder. Taylor did not testify at trial but did give a statement to law enforcement that he and Merriweather were in the trailer that night. He also stated that he took a gun from Merriweather and used the gun to shoot Stallings. At the close of trial, the circuit court refused to give Taylor's second-degree-murder instruction by stating:

> If you're in a house where you don't have the right to be in the middle of the night and you shoot a gun and you kill somebody, how can that be second-degree murder? I think there's caselaw that says that can't be. I mean the only evidence before the jury is that he was in the house and they had obtained entry by apparently kicking the door in. I think they've submitted a first-degree murder and it was a lesser—I don't see how you can get a second-degree murder so I'm going to refuse [proposed defense instruction 1].

¶21. We agree that Taylor fails to make a sufficient showing of evidence whereby a reasonable jury could have acquitted him of capital murder and then convicted him of second-degree murder. Taylor's only piece of evidence justifying the second-degree-murder instruction was his statement to investigators that "he did not intend to shoot [Stallings] and that he simply shot the gun as a way to wake up [Stallings] from his sleep." This evidence, however, does not separate Taylor from the burglary. Sufficient evidence existed to show that Taylor gained entry into the house by force and was there to "hit a lick." This certainly could lead a jury to find Taylor guilty of burglary, and the fact that Stallings died as a result

9

elevates the crime to capital murder.

¶22. Viewing the evidence in a light most favorable to Taylor, we find no evidentiary basis upon which a reasonable jury could find Taylor not guilty of capital murder but guilty of second-degree murder. We therefore find no error in the circuit court's decision to refuse to give this lesser-included-offense instruction.

## II. Motion to Suppress

¶23. We also find no error in the circuit court's determination that Taylor's confession was knowingly, intelligently, and voluntarily given. We therefore affirm the denial of Taylor's motion to suppress his comments to investigators.

¶24. As the United States Supreme Court established in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), a defendant must be advised of his right to remain silent and his right to an attorney before any police questioning can take place during custodial interrogation. Once informed of these rights, an accused may waive them if he so desires and respond to questioning. *Jordan v. State*, 995 So. 2d 94, 106 (¶30) (Miss. 2008). "Waiver of the constitutional rights to remain silent and to counsel must be knowing, [intelligent,] and [voluntary]." *Moore v. State*, 2017-KA-00379-SCT, 2019 WL 4316161, at *3 (¶21) (Miss. May 30, 2019). "[A] waiver is knowing and intelligent if it is made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Brown v. State*, 130 So. 3d 1074, 1079 (¶11) (Miss. 2013) (citing *Coverson v. State*, 617 So. 2d 642, 646 (Miss. 1993)) (internal quotations marks omitted). "Waiver is considered voluntary if it is the result of a free and deliberate choice rather than intimidation,

coercion[,] or deception." *Roberts v. State*, 234 So. 3d 1251, 1260 (¶22) (Miss. 2017) (internal quotation marks omitted).

¶25.    "We will not disturb a court's denial of a motion to suppress unless the incorrect legal principle was applied; if there was no substantial evidence to support a knowing, [intelligent,] and [voluntary] waiver of *Miranda* rights; and if the denial was a result of manifest error." *Tard v. State*, 132 So. 3d 550, 552 (¶9) (Miss. 2014) (internal quotation marks omitted).  Taylor asserts in his brief that the circuit court applied the wrong standard when reviewing his motion to suppress.  But the record clearly reflects that the circuit court considered the totality of the circumstances to determine whether the *Miranda* waiver was knowing, intelligent, and voluntary.  *Tard*, 132 So. 3d at 553 (¶11).  "The totality of the circumstances includes consideration of the defendant's experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation." *Roberts*, 234 So. 3d at 1260 (¶23).  "Because the standard of manifest error is high, we will not reverse unless the trial court's [admission] contravened the substantial weight of the evidence." *Batiste v. State*, 121 So. 3d 808, 858 (¶122) (Miss. 2013).

¶26.    The record reflects that Taylor was read his *Miranda* rights twice by officers.  The first time being his initial arrest, and the second, before he was questioned.  The official transcripts of Taylor's interview with Sergeant Perrigin explicitly state that when asked if Taylor understood his rights, he indicated "yes."

¶27. The relevant portion of Taylor's interview is when he makes the statement, "Man, I don't even want to talk about it no more, alright. I don't want to talk about it no more." Taylor argues that this statement constitutes an invocation of his right to remain silent. Taylor continued to speak with the officers present, despite his remarks, which the officers did not interpret to be an invocation of the right to silence.

¶28. Taylor relies on *Jones v. State*, 461 So. 2d 686 (Miss. 1984), to argue that his statement was inadmissible due to the invocation of his Fifth Amendment rights. In *Jones*, the defendant, a mildly mentally retarded individual, argued that his statement, "I prefer not to speak on that," constituted an invocation of his right to silence. *Id.* at 698-99. The Mississippi Supreme Court ruled that based on Jones's mental abilities, that statement was sufficient to invoke his right to remain silent and ruled that officers had violated that right by continuing to question him. *Id.* However, the case before us is distinguishable from *Jones*.

¶29. The supreme court in *Jones* determined that Jones's mental retardation was the central factor in the voluntariness of his confession. *Id.* at 696. In the case at hand, however, Taylor's listed IQ falls outside of the range for mental retardation.[2] Therefore, Taylor has no such basis to rely upon. Additionally, the circuit court established that Taylor functioned at an average intellectual capacity. The circuit court judge also praised Taylor's writing ability with the documents he prepared and filed himself, stating that they appeared to be prepared by "somebody who can educate himself and has educated himself." Finally, the

---

[2] The circuit court determined that Taylor's IQ was 82, whereas Jones's was between 60 and 70.

circuit court in *Jones* determined that, based upon the testimony, "there [was] obviously no doubt in the minds of [the officers] that Jones was invoking his constitutional privilege against further self-incrimination." *Id*. at 701. In the case sub judice, Taylor's action gave the officers no obvious indication that he wished to invoke his rights and continued to speak with the officers.

¶30. Again, whether a defendant knowingly, intelligently, and voluntarily waives his rights is a factual question to be determined by the trial judge under the totality of the circumstances." *McGowan v. State*, 706 So. 2d 231, 235 (¶12) (Miss. 1997). Because the trial judge sits as the finder of fact in these matters, we give great deference to the court's decision to admit such incriminating statements. *Gillett v. State*, 56 So. 3d 469, 484-85 (¶29) (Miss. 2010). A heavy burden must be met in order to overturn an unfavorable ruling on a defendant's motion to suppress. *Id*. That burden has not been met here. Taylor was informed of his rights twice by police, and yet he still decided to waive his rights. Taylor had the intellectual capacity to know what he was doing, as he did not suffer from any form of mental retardation. He likewise acted as though he fully understood his rights and continued conversation with the officers, thus giving them no legitimate indication that he was invoking his *Miranda* rights. Therefore, the circuit court determined, based upon the totality of the circumstances, that Taylor's statements were admissible.

¶31. The dissent views Taylor's statements as a clear expression of his right to remain silent, which the police officers blatantly chose to ignore. Specifically, the dissent argues that the both officers did understand Taylor's words and behavior to mean that he had

invoked his rights and chose to attack those rights. Therefore, the dissent argues that the circuit court violated Taylor's constitutional rights and committed reversible error by allowing his confession into evidence. But where a trial court admits statements in potential violation of a defendant's Fifth Amendment rights, such admissions are still amenable to a harmless-error analysis. *Hutto v. State*, 227 So. 3d 963, 980 (¶49) (Miss. 2017). Further, to be held harmless, we must determine that the violation of the defendant's constitutional right is harmless beyond a reasonable doubt. *Id*. The Supreme Court has determined that where the weight of the evidence against the defendant is overwhelming, any potential violation of the defendant's constitutional rights may constitute harmless error. *Id*. Therefore, even where Taylor's statements could be considered an invocation of his rights, any potential constitutional violation caused by the admission of his confession still amounts to harmless error.

¶32.     Here, the record certainly reflects an overwhelming amount of evidence pointing to Taylor as the perpetrator of the crime. The circuit court heard testimony from no less than four witnesses placing Taylor in the trailer with the gun on the night of Stallings's murder. Brown, Lee, and Brock all specifically testified that Taylor took Cameron's gun while in the trailer and, after a second gunshot was fired, Taylor ran out of the trailer stating that he had "shot a guy" and asking all the men not to speak about the incident. Such evidence convinces this Court, beyond a reasonable doubt, that any potential constitutional violation against Taylor would be harmless.

¶33.     The dissent argues that even "[i]f the evidence of guilt against the defendant is ample

14

as the majority says, then reverse and remand, and let him have a trial free from the stain of constitutional violations." This argument, however, ignores one very important legal concept. Taylor's confession is not necessary for a jury to convict him of capital murder. Regardless of the admissibility of Taylor's statement, capital murder does not require Taylor to have shot Stallings. Again, capital murder is defined as "The killing of a human being without the authority of law by any means or in any manner . . . (e) When done with or without any design to effect death, *by any person engaged in the commission of . . . burglary . . . or in any attempt to commit such [a] felon[y]*." Miss. Code Ann. § 97-3-19(2)(e) (emphasis added). For example, in *Scarborough v. State*, 956 So. 2d 382, 383 (¶5) (Miss. Ct. App. 2007), the defendant testified that she and several friends concocted a plan to rob the victim. During the commission of the robbery, two of the defendant's friends killed the victim. *Id*. at 384-84 (¶¶13-14). The defendant was ultimately convicted of capital murder and appealed to this Court. *Id*. at 385 (¶15). The defendant argued that she did not participate in killing the victim and therefore could not be convicted of capital murder. *Id*. at 387 (¶27). In affirming the defendant's conviction and sentence, we found:

> It is uncontroverted that [the defendant] administered no physical blows to [the victim]. However, the jury was charged with determining whether [the defendant] participated in the *robbery* of [the victim], *not if she actually administered the blows which killed him*. If it was determined that she did, in fact, participate in the robbery, then she could have been found guilty under the capital murder statute.

*Id*. at 386 (¶20). Pursuant to section 97-3-19(2)(e), the defendant admitted to participating in the robbery, which led to the victim's death, and therefore, a reasonable jury could have found her guilty of capital murder. *Id*. at 387 (¶27).

15

¶34. The same can be said for Taylor. In the very same interview, prior to the statements in question, Taylor confirmed that he and Cameron were burglarizing the trailer, which resulted in Stallings's death. Regardless of the admissibility of any statements made after that point, Taylor participated in the underlying felony, and therefore, a reasonable jury could easily find him guilty of capital murder beyond a reasonable doubt. Any potential constitutional violation also amounts to harmless error for this reason.

¶35. We are mindful of the Supreme Court's recent decision in *Moore v. State*, 2017-KA-00379-SCT, 2019 WL 4316161 (Miss. May 30, 2019). In *Moore*, the Supreme Court reiterated that where a suspect expressly invokes his right to remain silent, all interviews must cease. *Moore*, 2019 WL 4316161, at *5 (¶31). But where the investigating officers are unsure whether a suspect's rights have been invoked, we agree that the best practice is for the officers "to stop questioning on any other subject and clarify with the suspect whether or not he intends to invoke his constitutional right." *Id*. While that practice did not occur here, there was sufficient evidence to support a finding that the officers proceeded with the interview believing that Taylor had not invoked his right to remain silent. Again, though, any potential violation in admitting Taylor's statements elicited by this conduct is harmless.

¶36. Given the deference owed to the circuit court, we ultimately find that Taylor's statements fail to constitute an invocation of his right to silence. However, we also find, beyond a reasonable doubt, that an overwhelming amount of evidence against Taylor exists, making any potential violation of Taylor's right to silence harmless.

¶37. Finally, any error in admitting Taylor's statements is also harmless because he

admitted to participating in the burglary that then led to Stallings's death. This evidence alone is enough to sustain a conviction for capital murder.

¶38. Therefore, taking into account the totality of the circumstances, this Court concludes that the circuit court did not err in its decision to deny Taylor's motion to suppress his confession to police.

## CONCLUSION

¶39. Taylor failed to establish an evidentiary basis warranting a second-degree murder instruction. As such, the circuit court did not err in denying his request for the lesser-included-offense instruction. Also, based on the totality of the circumstances, we find no error in the circuit court's decision to deny Taylor's motion to suppress his statements to the police officers. We therefore affirm the circuit court's judgment and also affirm Taylor's conviction and sentence to life imprisonment without eligibility for parole.

¶40. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, LAWRENCE AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J.; McDONALD, J., JOINS IN PART. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**J. WILSON, P.J., CONCURRING IN PART AND IN RESULT:**

¶41. I concur in part and in the result. I write separately to address the admissibility of Taylor's confession.

> ***I.*** ***The admissibility of part of Taylor's May 27, 2011 interview is unclear under current Mississippi Supreme Court precedent.***

17

¶42. Taylor was informed of his *Miranda* rights at the outset of his May 27, 2011 interview with Investigator Eli Perrigin and Lieutenant Tony Perkins, and he voluntarily waived those rights and agreed to talk. The trial judge found that Taylor's waiver and statements were "voluntary," and there is substantial evidence to support those findings. The issues on appeal are whether Taylor sufficiently invoked his right to remain silent during the interview, and if so, whether the remaining part of the interview was inadmissible for that reason. *See Sipp v. State*, 936 So. 2d 326, 330-31 (¶¶6-8) (Miss. 2006) (distinguishing between statements that are actually involuntary and statements that are "inadmissible due to some technical violation of *Miranda*" or because an interrogation continued after a suspect invoked his Fifth Amendment or Sixth Amendment rights).

¶43. After Taylor voluntarily waived his *Miranda* rights, he discussed the facts surrounding the burglary and Stallings's murder at length. Taylor admitted that he took part in the burglary and that Stallings was killed during the burglary. However, Taylor denied that he shot Stallings. Perrigin and Perkins told Taylor that the four people who were with him and his girlfriend had all stated that they witnessed Taylor shoot Stallings or heard him confess to it. Taylor continued to deny shooting Stallings, while Perrigin and Perkins continued to encourage him to come clean. At page 46 of the interview transcript, Taylor stated, "I didn't shoot that man though. Man, I don't even want to talk about it no more, alright. I don't want to talk about it no more." Perrigin and Perkins continued to ask questions. Taylor did not answer but eventually asked, "Are y'all through now?" Perrigin and Perkins continued the interview, and Taylor confessed to shooting Stallings.

18

¶44. In context, a reasonable officer could have interpreted Taylor's comments as "an expression of [his] frustration with [Perrigin's and Perkins's] failure to accept [his] repeated insistence that he [did not shoot Stallings], rather than an unambiguous invocation of the right to remain silent." *People v. Williams*, 233 P.3d 1000, 1023 (Cal. 2010) (interpreting similar statements by a suspect during an interview). Taylor waived his *Miranda* rights, he admitted that he took part in the burglary, and he admitted that Stallings was killed during the burglary. He engaged in a lengthy, voluntary discussion with Perrigin and Perkins. Taylor repeatedly tried to persuade the officers that he did not shoot Stallings, but the officers remained unpersuaded. Under the circumstances, Perrigin and Perkins could have understood Taylor's comments that he did not "want to talk about it no more" as an expression of frustration rather than an unambiguous invocation.

¶45. Under the U.S. Constitution, officers are not required to stop questioning a suspect based on ambiguous statements. In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court held that a "suspect must *unambiguously* request counsel" in order to invoke his right to counsel under *Miranda* and *Edwards v. Arizona*, 451 U.S. 477 (1981). *Davis*, 512 U.S. at 459 (emphasis added). The Court declined to "require law enforcement to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Id.* The Court also "decline[d] to adopt a rule requiring officers to ask clarifying questions" in response to ambiguous remarks. *Id.* at 461. Rather, the Court held that "officers have no obligation to stop questioning" a suspect unless the suspect unambiguously and unequivocally requests counsel. *Id.* at 461-62. Subsequently, in *Berghuis v. Thompkins*,

560 U.S. 370 (2010), the Court held that the same rules apply to a suspect's invocation of the right to remain silent. *Id.* at 381-82. That is, a suspect must invoke his right to remain silent in unambiguous terms. Ambiguous comments do not require officers to cease questioning or ask clarifying questions. *Id.*

¶46. The state of the law is less clear under the Mississippi Constitution. In *Holland v. State*, 587 So. 2d 848 (1991), our Supreme Court held that if a suspect makes an ambiguous statement that could be interpreted as an invocation of his right to counsel, questioning must cease except for limited questions tailored to clarify the ambiguity in the suspect's statement. *Id.* at 856-57. *Holland* involved a suspect's ambiguous reference to an attorney, "but there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel." *Berghuis*, 560 U.S. at 381; *accord Moore v. State*, No. 2017-KA-00379-SCT, 2019 WL 4316161, at *6 (¶33) (Miss. May 30, 2019) ("extend[ing]" *Holland*'s "same analysis," at least in part, "to cases involving the invocation of the right to remain silent").

¶47. The rule that the Mississippi Supreme Court adopted in *Holland* obviously differs from the rule that the U.S. Supreme Court later adopted in *Davis*. After the U.S. Supreme Court's decision in *Davis*, our Supreme Court appeared to adopt *Davis* as controlling authority for purposes of both the Mississippi Constitution and the U.S. Constitution. In *Barnes v. State*, 30 So. 3d 313 (Miss. 2010), the Court discussed and seemingly followed *Davis*'s holdings in rejecting a defendant's claim that her statements were obtained in violation of both the Mississippi Constitution and the U.S. Constitution. *Id.* at 316-18 (¶¶7-

15). The Court's opinion in *Barnes* did not mention its prior opinion in *Holland*.

¶48. Four years later, however, our Supreme Court stated that the U.S. Supreme Court's decision in "*Davis* does not require Mississippi to follow the minimum standard that the federal government has set for itself." *Downey v. State*, 144 So. 3d 146, 151 (¶9) (Miss. 2014). In *Downey*, our Supreme Court stated that it would continue to follow *Holland* under the Mississippi Constitution in order to "more strictly enforce the right to counsel during custodial interrogations." *Id.*

¶49. The Mississippi Supreme Court revisited the issue again just one year later. In *Franklin v. State*, 170 So. 3d 481 (Miss. 2015), a plurality of the Court followed *Davis* for purposes of both the Mississippi and the U.S. Constitution. *Id.* at 487-91 (¶¶24-37) (plurality op.). In addition, the plurality denied "that the Mississippi Constitution provides greater protection than the U.S. Constitution to criminal suspects who invoke the right to counsel during custodial interrogations." *Id.* at 491 (¶37). However, it is not clear that a majority of the Court agreed with the plurality's conclusions. *See id.* at 492 (¶40) (Kitchens, J., concurring in part and dissenting in part) (arguing that *Downey* and *Holland* correctly interpret the Mississippi Constitution).[3]

¶50. Finally, in *Moore*, our Supreme Court discussed both *Davis* and *Holland* in the context of a claim that police officers improperly questioned a suspect after he invoked his

---

[3] In *Franklin*, all nine justices agreed that the defendant did not invoke his right to counsel, that his statement was admissible, and that his conviction should be affirmed. Four justices joined the plurality opinion. Two justices joined Justice Kitchens's opinion concurring in part and in the result and dissenting in part. Two justices concurred in the plurality opinion in unspecified part and in the result without a separate opinion.

21

right to remain silent. Citing *Holland*, the Court stated: "Mississippi law is well-established, in cases involving the invocation of the right to counsel, that an interviewing officer *may* clarify an ambiguous invocation [of the right to counsel]. Today, we extend this same analysis to cases involving the invocation of the right to remain silent." *Moore*, 2019 WL 4316161, at *6 (¶33) (emphasis added; citation omitted). However, the Court also discussed *Davis* and its applicability in "the right-to-remain silent context." *Id.* at *5 (¶¶31-32). And the Court also referred to clarifying questions as "good police practice," rather than a constitutional requirement. *Id.* at *5 (¶31) (quoting *Davis*, 512 U.S. at 461). In addition, the Court's opinion in *Moore* did not cite either *Downey* or *Franklin*.[4]

¶51. In light of our Supreme Court's decisions in *Downey*, *Franklin*, and *Moore*, the state of the law in Mississippi is, at least to me, unclear: If a suspect makes an ambiguous statement that could be interpreted as invocation of his right to remain silent or right to counsel, are officers limited to asking questions tailored to clarifying that ambiguity? Or may officers continue the interrogation without limitation? The issue could be important in this case because Taylor's statements were at least ambiguous, and officers continued the interview without asking clarifying questions. The issue is not outcome-determinative in this case because, as explained below, any error in admitting portions of Taylor's statement was harmless. But the law on this issue should be clarified because clear rules for interrogations are needed for "effective law enforcement." *Davis*, 512 U.S. at 461. "Although the courts

---

[4] In *Moore*, the defendant failed to argue in the trial court that his statement was inadmissible because it was obtained after he invoked his right to remain silent. *Moore*, 2019 WL 4316161, at *5 (¶30). Therefore, the Supreme Court reviewed the issue only for "plain error," *id.*, which may account for the ambiguity in the opinion.

ensure compliance with the *Miranda* requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect." *Id.* As the law now stands, a reasonable officer in Mississippi would not know how he or she must respond to an ambiguous statement that could be interpreted as an invocation.

## II. *Any error in admitting part of Taylor's May 27, 2011 interview was harmless.*

¶52. In this particular case, any error in admitting part of Taylor's statement to Perrigin and Perkins was harmless for three reasons. *First*, Taylor was charged with capital murder for a killing done during the commission of a burglary. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 2018). Before Taylor ever said that he did not "want to talk about it no more," he had already admitted to knowingly participating in the burglary that resulted in Stallings's death. That was all that was necessary for the jury to convict of him of capital murder. "To find [Taylor] guilty of capital murder, the jury did not need to find he was the shooter," only that he was a principal or accessory before the fact in the underlying felony of burglary. *Dampier v. State*, 973 So. 2d 221, 231 (¶28) (Miss. 2008). Indeed, given Taylor's admitted participation in the burglary, "it is largely irrelevant who did the shooting." *Randall v. State*, 716 So. 2d 584, 590 (¶32) (Miss. 1998).

¶53. *Second*, Taylor confessed twice subsequently to shooting Stallings. On May 31, 2011, four days after his initial confession, Taylor signed a written confession in which he again admitted to shooting Stallings. Perrigin re-advised Taylor of his rights prior to that statement, and Taylor signed a *Miranda* waiver. There was no evidence that Taylor's May 31 statement was the product of any promises, threats, or coercion. Then, on June 2, 2011,

Taylor asked to see Perrigin. When Taylor was brought to Perrigin's office, he told Perrigin that he wanted to take full responsibility for the murder and that he felt bad for what he had done. This meeting occurred at Taylor's request, and again there was no evidence that the confession was the product of any promises, threats, or coercion. These subsequent confessions raise different issues, which Taylor does not address on appeal. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985) (holding that an initial statement that is voluntary but "technically" obtained "in violation of *Miranda*" does not necessarily require suppression of a later statement that is "voluntarily made"); *Martin v. Wainwright*, 770 F.2d 918, 928 (11th Cir. 1985) (holding that *Elstad* applies whether the suspect's initial statement was un-warned or obtained after the suspect invoked his rights under *Miranda*), *modified on other grounds on denial of reh'g*, 781 F.2d 185 (11th Cir. 1986), *abrogation on other grounds recognized by Coleman v. Singletary*, 30 F.3d 1420, 1424-25 (11th Cir. 1994). Given that Taylor has not provided any argument for suppressing his subsequent confessions, the admission of his initial confession is, at most, harmless error.

¶54.  *Third*, as the majority notes, Brown, Lee, and Brock all testified that Taylor admitted to him that he shot a man inside the Loves' home. Taylor's girlfriend, Cox, also testified that Taylor admitted to shooting a man during the burglary. Thus, there was ample evidence that Taylor was the shooter even without his confession.[5] Therefore, any error in the admission of portions of his interview with Perrigin and Perkins was harmless.

## CONCLUSION

---

[5] Moreover, as noted above, Taylor was guilty of capital murder regardless of whether he was the shooter. *Dampier*, 973 So. 2d at 231 (¶28); *Randall*, 716 So. 2d at 590 (¶32).

24

¶55. I concur in part and in the result. Based on our Supreme Court's decisions in *Downey*, *Franklin*, and *Moore*, I am uncertain whether the latter part of Taylor's May 27, 2011 interview was admissible. But I agree with the majority that any error in the admission of that part of the interview was harmless.

**BARNES, C.J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶56. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966). There may be no clearer statement of law than that one, made fifty-one years ago. Our Court today does not just ignore those clear words but also pretends they do not apply. I refuse to take that passive approach to a cornerstone of American constitutional law.

¶57. Writing for the majority in *Miranda*, Chief Justice Warren explained that "if the individual is alone and indicates *in any manner* that he does not wish to be interrogated, *the police may not question him*." *Id.* (emphasis added). "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id*.

¶58. Far from being a muddled area of law, the exact scenario faced in this case by Taylor was addressed decades ago. *Miranda* was decided to preempt the haranguing he experienced, which was routine until the U.S. Supreme Court ruled that it violated multiple

25

rights under our Constitution. What happened in this interrogation would not have been tolerated in 1966 and should not be tolerated in 2019:

> [Investigator Perrigin]: Maybe, you were rushing out of there and maybe you tripped like he said. But, we need to get down to the point and you need to be telling us.
>
> [Officer Perkins]: Maybe you were doing the same thing that they were doing at the other end and you just shot to scare him. And didn't actually mean to shoot him. I don't know, but, something happen.
>
> [Investigator Perrigin]: That's exactly what it is.
>
> [Officer Perkins]: To cause you to shoot him or to warn him or whatever.
>
> [Joshua Taylor]: I didn't shoot that man though. *Man, I don't even want to talk about it no more, alright. I don't want to talk about it no more.*

(State's Ex. 4, at 46) (emphasis added).[6]

¶59. Under the clear wording of a fifty-year old decision, the interrogation must have stopped at this time. Yet the officers did not hesitate, and they immediately continued their interrogation. In fact, the suspect barely got the words, "I don't want to talk about it no more," out before the officers launched back in. Taylor was no longer even responding:

> [Investigator Perrigin]: So, you going to lay in there [in that cell] tonight all night long.
>
> [Officer Perkins]: Whether we talk about it anymore, *don't really matter*. Cause, its weighing heavy on your chest and you going to feel down until you tell the truth. I mean you can sit here and lie to me. You can sit here and lie to Eli [Perrigin], not tell us the whole truth. You can't lie to yourself, it's going to eat you up inside.
>
> [Investigator Perrigin]: You know that.

---

[6] The transcription was provided by the State, and we have retained the language it used to describe the defendant's body language in the interview.

[Officer Perkins]: It's going to eat you up, it's already has been. That's why you broke down and cried to her. It's going to break you down. It's going to hurt yourself.

[period of silence for a few seconds]

[Investigator Perrigin]: *Come on and talk to me alright.* Tell me what you're thinking.

(State's Ex. 4, at 46-47) (emphasis added).

¶60.    The officers' own questions show two things: first, the police *knew* the suspect had invoked his right to silence because, second, they were *attacking* it. Their attack was on two fronts—(1) by saying his silence "don't really matter" because he secretly wanted to talk to them but did not and (2) by saying, "Come on and talk to me alright." A person does not say "come on and talk to me" unless someone has already told you he does not want to talk to you and has gone quiet.

¶61.    So, the officers knew that the *Miranda* right had been invoked but chipped away at it, like pulling down sandbags piled up on a levee, until the floodwaters of a confession inevitably breached. There were long stretches of complete silence, during which Taylor did not say a word. Indeed, after his unequivocal invocation of the right to silence, *Taylor did not speak for five minutes and forty-four seconds*. During this period of complete silence on his behalf, the officers asked dozens of increasingly heated questions.

¶62.    After those nearly six minutes of silence, Taylor gave in. Emotionally exhausted and visibly crying, Taylor gave up the confession so doggedly sought by the police after consciously violating his constitutional rights:

27

[Officer Perkins]: You'll feel better once you say it.

[Investigator Perrigin]: Just tell us what happen dude.

[Officer Perkins]: We're sitting right here looking at you.

Taylor: [puts his head down on the interrogation room table]

[Officer Perkins]: We know, we can tell it. It's all over you man and you're wanting to tell it, you're wanting to tell it.

[At this point the defendant in this case covers his face with his hands, and begins to cry.]

[Investigator Perkins]: It's about to kill you, just tell us.

Taylor: [shaking his head]

[Investigator Perrigin]: What happen[ed]?

[Officer Perkins]: You shot him?

(State's Ex. 4, at 49). Again, this vigorous shakedown happened *after* the defendant said, "*Man, I don't even want to talk about it no more, alright. I don't want to talk about it no more.*" And it happened during a nearly six minute patch of silence by the suspect.

¶63.   Under any reading of the cornerstone 1966 interpretation of constitutional law, this is a violation of the rights of the suspect.

¶64.   Even if we continue to pretend that these two officers somehow did not understand what they were doing, which they did, they failed to adhere to the best practices our Supreme Court reiterated earlier this year. "When law enforcement officers are unsure whether a suspect intends to invoke his right to remain silent, it is good police practice for the interviewing officers to stop questioning on any other subject and clarify with the suspect

28

whether or not he intends to invoke his constitutional right." *Moore v. State*, 2017-KA-00379-SCT, 2019 WL 4316161, at \*5 (¶31) (Miss. May 30, 2019) (internal quotation marks omitted). "In Mississippi, if a [suspect] makes equivocal or ambiguous utterances which could be interpreted as an invocation, then the trend is to require cessation of interrogation except for strictly-limited inquiry for clarification purposes." *Id.* (internal quotation mark omitted).

¶65. Even if the police did not understand what "*I don't want to talk about it no more*" meant, which they fully understood by their obvious attack on the invocation of silence, they failed to follow best practices in stopping and asking if Taylor meant to invoke his right to silence. Of course they did not do that because the invocation of *Miranda* was not confused or ambiguous at all; the police knew the suspect had invoked his right to silence but kept questioning him anyway, spanning nearly six minutes of time.

¶66. This practice is why we cannot then double down on the fiction that this "accidental" violation of constitutional rights could be harmless. Any constitutional violation as conspicuous as the one that occurred when the officers chose to ignore Taylor's clear invocation of his right to silence and continued to question him can hardly be characterized as harmless. Our constitutional rights, so concretely manifested in *Miranda*, including our right to silence, must not be so easily swept aside. We must not grant full permission to ignore *Miranda* and the Constitution; for it is not our right to grant this permission to the police because it was prohibited in 1966 in a decision that clarified the very bedrock of our joining together as a constitutional republic.

¶67. In truth *Miranda* is just an access point to the heroic rights invested to the people by our Constitution. We must not construct barriers to prevent access to our core constitutional rights. By finding harmless error, the majority pulls people farther away from the rights they have in our society.

¶68. This practice is also why we should not pretend there is some set of precise magic words to invoke the rights under the Constitution. If there is an ambiguous invocation of a request for an attorney or to remain silent, the police must stop and clarify. The rights to an attorney and silence are there for all of us, and we cannot sanction sweeping them aside.

¶69. If the evidence of guilt against the defendant is ample as the majority says, then reverse and remand, and let him have a trial free of the stain of constitutional violations. In straining to find no error, and in trying so hard to pretend what happened was okay, we magnify the violation.

¶70. The majority does reach the correct conclusion that a second-degree murder instruction was properly denied. Yet we should not allow a violation of the right to silence, because that right is intimately tied "to the respect a government—state or federal—must accord to the dignity and integrity of its citizens." *Miranda*, 384 U.S. at 460. Because I believe we must not erode the dignity and integrity of Mississippians, I will not join the majority in full.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**

30